# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. CORNELIUS D. HICKS, aka "HOLLYWOOD," and TROY LEE SPRINGFIELD

### Direct Appeal from the Circuit Court for Lauderdale County
### No. 7408     Joseph H. Walker, III, Judge

---

### No. W2003-03035-CCA-R3-CD  - Filed September 14, 2004

---

The defendants, Cornelius D. Hicks and Troy Lee Springfield, and two codefendants, Bryan T. Oldham and Kenyale M. Pirtle, were charged with aggravated assault, a Class C felony, for firing a gun at the victim, Keiston Campbell, as he drove his car down a Henning street. Pirtle subsequently pled guilty to aggravated assault, and a fifth individual involved in the incident had his case handled in juvenile court. The three remaining defendants, Springfield, Hicks, and Oldham, were tried jointly before a Lauderdale County Circuit Court jury, which acquitted Oldham but convicted both Hicks and Springfield of the lesser-included offense of facilitation of aggravated assault, a Class D felony. The trial court sentenced Hicks as a Range I, standard offender to three years in the Department of Correction, with the sentence suspended and the defendant placed on supervised probation following service of 250 days, to be served consecutively to a sentence for an offense for which he was on probation at the time of the instant offense. Springfield was sentenced as a Range I, standard offender to three years in the Department of Correction, with the sentence ordered to be served consecutively to his sentence for violation of parole. The sole issue Hicks raises on appeal is whether the evidence was sufficient to sustain his conviction. Springfield challenges the trial court's denial of his motions to sever his trial and for judgment of acquittal. Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

D. Michael Dunavant, Ripley, Tennessee, for the appellant, Cornelius D. Hicks; and David M. Livingston, Brownsville, Tennessee, for the appellant, Troy Lee Springfield.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

### State's Proof

The incident at issue in this case occurred shortly after 10:00 p.m. on December 4, 2002, near the intersection of Church and Moore Streets in Henning. The victim testified he had just left the home of his friend, James Barbee, and was on his way in his mother's brown 1977 Buick to pick up Kelly Currie to take her to the Midway Market when he passed a brown, four-door Oldsmobile Cutlass in front of the Henning Police Department. As he proceeded to the Henning Village Apartments where Currie lived, he saw in his rearview mirror that the Cutlass, with five African-American males inside, was traveling behind him. The men traveling in the Cutlass pulled into Henning Village, turned off their lights, and parked, but the victim did not see anyone get out of the vehicle at that time. The victim said he thought he recognized the rims on the Cutlass as ones which had been on a car that had been stolen from "Mr. Treadway's son." Therefore, when he saw the Cutlass again at the Midway Market he telephoned Barbee and told him he had just seen Mr. Treadway's rims on another vehicle. Shortly after both he and the men in the Cutlass had pulled out of the market, Barbee met him in the area and he pointed the vehicle out to him. Barbee pulled in behind the Cutlass to get its tag number while the victim took Currie home.

The victim testified he was returning to meet Barbee when he saw the Cutlass drop off two passengers who walked to the door of a vacant house on Moore Street. When he came back around to Moore after circling the block, the same two men were walking up the street. One of the two, who was wearing a toboggan hat that tied under his chin and had his hands in his pockets, nodded to the victim as if to say, "What's up?" but kept walking, while the second man, who was wearing a ski mask pulled down over his face and carrying a pistol, approached the victim's car, saying, "Hey, hey, stop." The man fired as the victim accelerated from the area, with the bullet striking the trunk of the victim's car, ricocheting, and shattering the rear windshield. Approximately two to three minutes later, the victim reported the shooting to Henning Police Officer Rhea at the Midway Market.

The victim testified the ski-masked shooter was wearing a dark, hooded sweater and possibly an Orlando Magic or Dallas Cowboys jacket, did not have a lot of hair on his head, and had a lighter complexion, similar to the victim's. He tentatively identified the masked man as Oldham, testifying that "from what [he was] thinking . . . Mr. Odom [sic]" was the one who had been wearing the ski mask and who had shot at him. The victim positively identified Hicks as the second man in the toboggan hat, stating he had been able to get a clear view of his face.

The victim testified he saw all four adult defendants when they got out of the Cutlass at the Midway Market. None was wearing a ski mask at that time, and he did not engage in conversation with either them or the juvenile, who remained inside the vehicle. He did not know any of the occupants of the Cutlass and telephoned Barbee, in part, because being trailed by men he did not know caused him fear. At one point during his testimony, the victim suggested that the defendants

might have been after the rims on his mother's car. He conceded, however, that the Cutlass was turning into the Henning Village Apartments as he was exiting the complex and he did not see the men trailing him as he drove to the Midway Market. He acknowledged Hicks made no threatening or violent moves toward him, and he never saw Hicks with a gun.

James Barbee testified the victim telephoned him shortly after leaving his house to tell him that some men were following him in a brown Cutlass. When he located the car, he pulled in behind it in his small, white Hyundai, watching as it pulled up, dropped off two men from the backseat who walked "up by the church," and then pulled off again. He then followed the car, recording its tag number and observing that, by the time it had "made [the] block," the two men who had been dropped off were walking up the street. At that point, the Cutlass continued straight and he turned left for City Hall. En route, he encountered the victim, who told him that the men had shot out his window. When they were unable to find anyone at City Hall, he and the victim separated to search for Officer Rhea. A short while later, he saw the victim talking to the officer, pulled up, and reported the tag number which he had recorded on his cell phone. Barbee acknowledged he neither heard nor saw the gunshots fired at the victim's vehicle. He testified, however, that the gunshot damage to the vehicle had not been present earlier in the evening.

A "BOLO" or "be on the lookout" for the Cutlass went out at approximately 10:28 p.m. Soon thereafter, Ripley Police Officers Jimmy Drake and Debbie Kirkpatrick, traveling in separate patrol cars, spotted the vehicle on Highland Street in Ripley and followed it to a residence on Hamby Circle. Officer Kirkpatrick testified that the two men in the front seat got out on the passenger side before she and Officer Drake had stopped, while the three in the backseat remained in the vehicle. She later learned that both the driver's door and the rear passenger's door were jammed and could not be opened from the inside. Officer Kirkpatrick testified that their search of the vehicle uncovered two guns: one on the rear floorboard underneath the front passenger's seat and a second jammed between the front armrests, with the barrel pointing toward the backseat. In her opinion, both guns were in a position where anyone in the vehicle could have exercised control over them. On cross-examination, she testified that the car was registered to Troy Springfield, and her records showed it was Springfield and Oldham who exited the front seat.

Officer Jimmy Drake, who corroborated Officer Kirkpatrick's account of the stop, identified the two small, chrome-plated automatic handguns that were found in the vehicle and agreed that the weapons were located where any of the five occupants could have reached them. On cross-examination, he acknowledged that a backseat passenger could have placed the guns in their respective locations during the five to ten seconds before Officer Kirkpatrick reached the vehicle; that the officers had to order one of the backseat passengers, who was initially moving around inside the vehicle, to stay still; and that none of the five occupants of the vehicle made any attempt to elude the officers or avoid arrest.

Kenyale Pirtle, who pled guilty to the aggravated assault of the victim on February 24, 2003, testified he, Springfield, Oldham, Hicks, and the juvenile, whom he knew as "Pac-Man," traveled from Haywood County to Henning on the night of the shooting to look for girls. Springfield was the

driver, Oldham rode in the front passenger seat, and he, Hicks, and the juvenile rode in the backseat. While they were riding around, someone who had been following them in a small, newer model white car tried to hit their vehicle from the side. He and Hicks then got out of the Cutlass and Hicks fired at the victim. Pirtle denied he wore a ski mask, possessed a gun, or fired at the victim, and claimed he never saw any guns, did not know any were in the car, and could not recall how many shots he heard Hicks fire at the victim. He further denied there was any talk among the defendants about shooting anyone, and maintained his sole purpose in traveling to Henning was to look for girls. He agreed his complexion was lighter than Hicks's and acknowledged Oldham had been getting a ride to his aunt's house in Henning and had slept for most of the drive, waking only when they reached the Midway Market.

Henning Police Chief James Treadway identified a ski mask, several "skull caps" or toboggans, and a pair of black gloves recovered from the Cutlass at the time of the defendants' arrest.

Ripley Police Sergeant Joey Rhea testified the victim approached him at the Midway Market between 10:10 and 10:15 p.m. to report the shooting. As he was searching for the vehicle the victim had described, the victim and Barbee met him on Moore Street, where Barbee provided the tag number for the vehicle. Sergeant Rhea testified he observed a bullet mark on the victim's trunk and a shattered rear windshield where the bullet had ricocheted off the trunk, but was unable to locate any bullets or shell casings.

At the request of the State, Sergeant Rhea read aloud from a statement Springfield gave on the night of the shooting in which he described dropping two of his passengers off on Moore Street, hearing gunshots as he drove around the block, and returning for the passengers who had guns.[1] Sergeant Rhea testified that Hicks gave an initial statement denying that he had been in Lauderdale County, but approximately one week later, he wrote the following statement:

> My statement is this[.]  I haven't committed no [sic] crime of the charges against me!  I'm [sic] came to Henning or Ripley to see my girl, a conflict of interest came about w[h]ere a car tried to run us off the road after someone try to hunt us down. ___ speed out of control after he had let ___ out to holla [sic] at some guy[.]  [W]e made a block so the time we made a block gunshots were fired[.]  ___ rush back to the scene and pick him up!  I don't [k]no[w] the circumstances of the shooting was about[.]  [A]ll I know that he said no one was hit so we all panic, I told them to get me to my girl['s] house because I didn't understand what happen [sic] or the reasons! ___ later told me he was a victim of something happen in Ripley later on so I felt the guys that were following us were after him to some

---

[1]The statement was redacted to eliminate the names of Springfield's codefendants, and Sergeant Rhea, accordingly, substituted the word "blank" for their names when reading the statement aloud to the jury. See Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

extent!  I know I don't own no [sic] pistol or I didn't have none [sic] in [the] car or bring none [sic] with me!  So this sta[te]ment that I has [sic] given sum [sic] up that basically that I'm just being a man and standing up to a charge that I didn't commit!

On cross-examination, Sergeant Rhea acknowledged Springfield did not state at what point he first learned of the existence of the handguns.

**Defense Proof**

Oldham's aunt, Lula B. Phillips, testified Oldham telephoned her on the day of the shooting to ask to borrow money.  When she agreed, he told her he would come to her house in Henning whenever he could find a ride.  Her next contact with him occurred at 1:00 or 1:30 the following morning, when he called to tell her he was in jail.

Bryan Oldham, who said he was nineteen years old at the time of the shooting, testified he went to Henning to borrow money from his aunt and his companions went to talk to some girls.  He slept in the front passenger seat during the drive, did not see any guns in the car, heard no conversation about shooting anyone, and never saw Hicks, Springfield, or Pirtle with a gun.  Oldham testified that a brown car followed them from the Midway Market to the street where they dropped off Pirtle and Hicks, who were going to a house to talk to some girls.  A white car "pull[ed] . . . up on [them]," as if the driver wanted to run them off the road, soon after they dropped the men off, and Springfield then turned to go to Oldham's aunt's house.  When they heard gunshots a couple of seconds later, they returned to Moore Street, where they picked up Pirtle and Hicks, who were alone and unhurt.  Neither was carrying a gun, and the only thing they said was "let's go."  Springfield pulled off at a normal rate of speed, but refused to take Oldham to his aunt's house, insisting instead that they drive to the home of a woman he knew in Ripley.

Hicks and Springfield elected not to testify and rested their cases without presenting any proof.

**ANALYSIS**

**I.  Sufficiency of the Evidence**

Hicks raises as his sole issue whether the evidence was sufficient to support his conviction for facilitation of aggravated assault.  Springfield also challenges the sufficiency of the convicting evidence, arguing that the trial court erred in denying his motion for judgment of acquittal.  The State responds by arguing that the evidence was more than sufficient to sustain Hicks's conviction and that Springfield has waived the issue by his failure to file a timely motion for a new trial.  Notwithstanding waiver, the State argues that the evidence against Springfield, was, likewise, more than sufficient for a rational trier of fact to find him guilty of facilitation of aggravated assault beyond a reasonable doubt.

-5-

The State asserts that Springfield's motion for a new trial was untimely because it was filed more than thirty days beyond the July 11, 2003, date on which his judgment was entered. However, although Hicks's judgment was entered on July 11, the record reveals that Springfield's was not entered until August 1, 2003. The record further reveals that Springfield filed his motion for a new trial on September 2, following the September 1 Labor Day holiday; the trial court overruled the motion on September 12; and Springfield filed his notice of appeal on October 8. Thus, both his motion for a new trial and his notice of appeal were timely.

We apply the same standard when reviewing whether a trial court erred in denying a motion for judgment of acquittal as when reviewing whether the evidence was sufficient to sustain a conviction. See State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). When the sufficiency of the evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Both defendants were convicted of the lesser-included offense of facilitation of aggravated assault. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, . . . the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003). A person commits aggravated

assault, *inter alia*, when the person intentionally or knowingly causes another to reasonably fear imminent bodily injury by the use or display of a deadly weapon. Id. §§ 39-13-101(a)(2), -102(a)(1)(B). A "[d]eadly weapon" specifically includes "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." Id. § 39-11-106(a)(5)(A).

Hicks argues the State failed to prove beyond a reasonable doubt he either knew that any of his codefendants intended to commit an aggravated assault or provided substantial assistance in the commission of that offense. In support, he cites, *inter alia*: the victim's identification of the lighter-skinned, ski-masked man as the shooter and his testimony that he did not see Hicks with a gun and Hicks did not threaten him or have any motive to assault him; Oldham's testimony that he never saw Hicks with a gun and heard no talk about a shooting; and the vague and inconsistent nature of the testimony provided by Pirtle, who, despite pleading guilty to aggravated assault, attributed the shooting to Hicks. Springfield argues there was no evidence to show any "predetermined design to commit the crime," or that he had any knowledge beforehand that the passengers he dropped off and returned to pick up were intending to commit an aggravated assault.

We conclude, however, that the evidence was sufficient to sustain both defendants' convictions for facilitation of aggravated assault. Viewed in the light most favorable to the State, the proof established that Springfield dropped Hicks and Pirtle off at a vacant house, that the two men walked together up the street and Hicks distracted the victim by nodding to him while Pirtle approached his car armed with a handgun and wearing a ski mask, that Pirtle fired at the victim as he fled in his vehicle, and finally, that Springfield returned immediately following the shooting to pick the men up and transport them from the town. When reviewing the sufficiency of the convicting evidence, we must presume that the jury resolved all conflicts and drew any reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Regardless of whether the defendants were motivated by "road rage," robbery, revenge, or something entirely different from what was suggested at trial, the evidence here was sufficient for the jury to reasonably infer that both defendants, knowing that Pirtle intended to commit an aggravated assault upon the victim, provided substantial assistance to him in the commission of that offense. This issue, therefore, is without merit.

## II. Trial Court's Denial of Springfield's Motion to Sever

Springfield additionally contends that the trial court erred in denying his motion to sever his trial, arguing that he was prejudiced by being tried with Hicks, "a named participant in the crime." We respectfully disagree.

A trial court shall grant a pretrial motion to sever if it is "deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(i) (2004). The decision to sever criminal defendants is wholly within the discretion of the trial court, State v. Maddox, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997), and cannot be interfered with absent "clear abuse." State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000).

Moreover, "[d]isparity in the evidence against the defendants is not alone sufficient to warrant the grant of a severance." Id. (citation omitted). This court has held that "[w]here a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant." State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000) (quoting State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).

We find no abuse of discretion by the trial court in denying Springfield's motion to sever. None of the defendants at trial presented an antagonistic defense, and there was no evidence that Springfield was prejudiced by being tried with Hicks, who was identified by the victim as one of the two men who approached his vehicle on the street. In this regard, we note that Oldham, whom the victim tentatively identified as the actual shooter, was acquitted by the jury. Thus, it was clear that the jury was able to separate the proof presented against each defendant. We conclude, therefore, that this issue is without merit.

## CONCLUSION

We conclude that the evidence was sufficient to sustain both defendants' convictions for facilitation of aggravated assault. We further conclude that the trial court did not err in denying Springfield's motion to sever. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE